1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7 | R. Z. C.,

8 |                Plaintiff,

     v.

C16-1064 TSZ

9

10 | NORTHSHORE SCHOOL
DISTRICT,

ORDER

11 |              Defendant.

12       THIS MATTER comes before the Court on Plaintiffs' Motion for Partial

13 Summary Judgment, docket no. 13, and Defendant's Cross-Motion for Summary

14 Judgment, docket no. 16. Having considered the motions, all pleadings filed in support

15 of and opposition to the motions, and the administrative record, the Court GRANTS

16 Defendant's Cross-Motion for Summary Judgment, DENIES Plaintiffs' Motion for

17 Partial Summary Judgment, and enters the following Order.

18 **<u>Introduction</u>**

19       Plaintiff R.Z.C. (the "Student") [1] brings two causes of action. First, the Student

20 seeks judicial review of an administrative law judge (the "ALJ") determination that: (1)

21 _____

22 [1] Although the Student's parents filed this lawsuit, the use of the defined term "Student" and the
corresponding male pronoun will collectively refer to the Student and his parents for ease of analysis,

23 unless otherwise specified.

1  Defendant Northshore School District's (the "District") reevaluation of the Student was

2  appropriate or any defects did not deny the Student Free Appropriate Public Education

3  ("FAPE"); (2) the District's decision to exit the Student from special education pursuant

4  to the reevaluation was legally correct; and (3) the Student's parents did not carry their

5  burden of proving the District failed to implement the Student's Individualized Education

6  Program ("IEP").

7      Second, the Student claims damages under Section 504 of the Rehabilitation Act

8  of 1973 alleging that the District: (1) denied the Student FAPE; (2) discriminated against

9  the Student; and (3) retaliated against the Student.

10      The Student's Motion for Partial Summary Judgment, docket no. 13 (the

11  "Motion"), is limited to the Student's first cause of action.  The Student asks the Court to

12  overturn the ALJ's decision and grant the Student an Independent Educational Evaluation

13  ("IEE").  The District's Cross-Motion for Summary Judgment, docket no. 16 (the "Cross-

14  Motion"), seeks summary judgment on all of the Student's claims.[2]  The District asks the

15  Court to affirm the ALJ's decision and dismiss the Student's Section 504 claims for

16  discrimination and retaliation.

17      For the reasons stated in this Order, the Student's Motion for Partial Summary

18  Judgment is DENIED.  The District's Cross-Motion for Summary Judgment is

19  GRANTED.

20

21

_____

22  [2] Plaintiff's Reply to the District's Opposition to Plaintiff's Motion for Partial Summary Judgment, and Response to the District's Cross-Motion for Summary Judgment on all Claims, docket no. 25, is referred to as "Plaintiff's Reply."  The District's Reply, docket no. 28, is referred to as "District's Reply."  For the reasons discussed in this Order, Plaintiff's Surreply, docket no. 29, need not be addressed.

23

ORDER - 2

**Background**

The Student has been a student within the District since elementary school. AR 1184. Between fourth grade and ninth grade, the Student qualified for special education services under the Specific Learning Disability ("SLD") category in the area of Written Expression. AR 1477–79, 1493.

In seventh and eighth grade, the Student received Specialized Designed Instruction ("SDI") in a general education class co-taught by a general education and special education teacher. AR 990, 427–28, 1445–46.

Leading up to the Student's ninth grade year, on October 23, 2014, the Student's IEP team (comprising District personnel) held a meeting with the Student's parents to address an issue with the Student's school schedule. AR 1220–21. Because the Student's parents did not wish to change his schedule, the Student would be unable to attend the ninth grade co-taught English class. AR 993–94; AR 895–96. The District proposed giving the Student his written language SDI in a general education class taught solely by a general education teacher, with R.Z.C.'s special education teacher providing limited consultation. AR 1464 (October 23, 2014, Prior Written Notice). The District implemented the Student's revised IEP plan, in which the Student's general education teacher focused on the Student's IEP goals in her general education class with 10 minutes of special education support from his special education teacher. AR 791, 793, 808–09, 1462.

The District also suggested to reevaluate the Student to determine whether he should be exited from the Section 504 Plan. AR 1464; AR 864–65, 882. While his

parents initially agreed, AR 997, 1185, 1222–23, they revoked their consent on

November 20, 2014. AR 999, 1222–23. Rather than complete the reevaluation, the

parents requested that the District pay for an IEE. *Id.* The District granted the parents'

request. AR 882–84, 1222–23.

The requested IEE was conducted in January 2015 by clinical neuropsychologist

Dr. Jennifer Blair, PhD. AR 1125–36. Among other evaluation procedures, Dr. Blair

administered the Wechsler Intelligence Scale for Children – Fifth Edition ("WISC-V"),

the Woodcock-Johnson III Normative Update Tests of Achievement ("WJ-III"), and the

Test of Written Language-third edition ("TOWL"). AR 1127. Her written report recited

the following areas of weakness:[3]

- On the WISC-V, the Student "earned a Full Scale IQ of 98 (45th percentile, average range) and a General Ability Index of 105 (63rd percentile, average range). AR 1128. The corresponding WISC-V subtests Dr. Blair performed identified difficulties with the Student's memory and ability to rapidly copy information—categories that the Student scored in the "low average" on. AR 1129.

- On the WJ-III, the Student's "ability to read quickly and efficiently (Reading Fluency) remain[ed] an area of relative weakness . . . ." AR 1130. Dr. Blair noted, however, that this did "not represent an area of specific disability, *per se*." AR 1130. The WJ-III also identified certain writing skills—including spelling, editing, and handwriting—as areas of weakness for the Student. AR 1131.

- Likewise, the TOWL-3 uncovered the Student's difficulties "with handwriting, spelling, punctuation, and capitalization." AR 1131. "On a measure of math fluency, . . . [the Student] scored much lower than expected. His ability to calculate and write down single digit math facts was an area of weakness for him. When not required to write down the math facts but to say them aloud, [the Student] scored better . . . but still lower than expected for his intellectual capacity." AR 1132.

---

[3] Dr. Blair's report also reported on other various areas where the Student performed averagely and above-averagely. These were not areas of concern.

Dr. Blair concluded that the Student's "troubles with writing meet Washington Administrative Code guidelines for a Specific Learning Disability in the area of Basic Writing.  Disorders of written expression are sometimes referred to as 'dysgraphia,' a general term that includes difficulties with fine motor control and handwriting, spelling and conventions, grammar, and various disorders of written expression."  AR 1134.[4] "His writing disability appears limited to the underlying basics of handwriting and conventions."  *Id.*

On February 27, 2015, the Student's parents and their attorney met with the Student's IEP team to review Dr. Blair's IEE and amend the Student's IEP.[5]  AR 1149–65 (the 2015 IEP Amendment); AR 887.  Among other things, the IEP meeting considered the Student's parents' concerns with his "writing, proofreading, and editing skills, as well as his spelling and ability to copy words down from the board in a classroom situation."  AR 1153.  At the meeting, the participants amended the Student's present level of educational performance, annual goals, and general education accommodations.  AR 1156, 1162; AR 875–76.

The District issued a Prior Written Notice on April 1, 2015, to implement the agreed upon amendments.  The Notice stated in relevant part:

> We are amending [the Student's] IEP upon the completion of his independent educational evaluation with Dr. Blair and the team's discussion of changes to the accommodations, as well as Parents' request to

---

[4] Dr. Blair later testified that she did not diagnose the Student with dysgraphia under the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V").  AR 966.

[5] At this time the IEP team included school psychologist Jacque Ter-Veen, special education teacher Julia Smith, occupational therapist Janet Prendergast, nurse Dee Allaway, general education teacher Pamela Sutton, and school principal "Sebastian Z.Z."  AR 1188.

amend the annual goals in light of Dr. Blair's findings of [the Student's] strength in essay writing and struggles with grammar, punctuation and spelling. We are also proposing a re-evaluation to consider the results of the IEE and to further evaluate fine motor skills and assistive technology needs.

AR 1162. The Notice gave the following reasons for the proposed amendments:

[Dr. Blair's] assessment resulted in average scores in reading and math, and written expression but noted areas of concern in basic writing, math fluency and handwriting. Based upon the updated assessment information, we are recommending some changes to [the Student's] current IEP and we are also recommending a re-evaluation based upon the concerns in fine motor skills. We are also going to consider the need for assistive technology as per previous recommendations of the IEP team and further recommendation in Dr. Blair's report.

*Id.* The Notice did not evaluate the suitability of any of Dr. Blair's testing or otherwise suggest any shortcomings in her analysis. It also did not discuss whether the areas of concern identified by Dr. Blair fell within the "Written Expression" category of SLD.[6]

On May 8, 2015, the Student's parents and IEP team met to review the District's reevaluation results. AR 1184. As planned in the IEP amendments, the results included a review of Dr. Blair's assessments, the Student's academic history and performance, and reports and recommendations from various District personnel who conducted additional assessments—including the Student's school occupational therapist, Janet Prendergast, and school psychologist Jacque Ter-Veen. AR 1180–1201.

Pursuant to the IEP team's review of the Student's data, the District concluded that R.Z.C. did not meet the eligibility criteria and no longer qualified for special education

---

[6] Pursuant to the IEP amendments, the District also issued a Reevaluation Notification / Consent to R.Z.C.'s parents, notifying them that the District would be reevaluating the Student to "review Dr. Blair's assessment and complete additional testing in the following areas: fine motor skills, assistive technology, age-appropriate transition and observation." AR 1182.

services because his areas of weakness did not adversely impact his general education classes. AR 1186 (citing Dr. Blair's evaluation). Notwithstanding this decision, the evaluation team determined that the following accommodations might be helpful: 1) additional time on assignments and tests; 2) a calculator; 3) a change in class setting for test taking; 3) no loss in credit for spelling/grammar errors in writing; 4) use of a classroom computer to produce essays and pieces of written work expected to be over a paragraph long, if requested; 5) provided with a hard copy of notes to copy from when class is taking notes from the whiteboard; 6) access to a laptop; and 7) use of word-prediction or voice-to-text software. AR 1187.

In May 2015, the District began developing a written "Section 504" plan for the Student "based on the recommendations made in [the Student's] comprehensive reevaluation." Declaration of Elizabeth Methot, docket no. 22 ("Methot Decl."), at ¶¶ 2, 6–7. At his parents' request, District personnel met with the Student to help set up a laptop and Co:Writer program discussed in the Section 504 plan. AR 836–39; AR 1780–99. The Student completed the school year on June 17, 2015. AR 1206.

The Student began high school in the fall of 2015, where he was enrolled in a full schedule of general education classes selected by the Student and his parents the previous spring. Methot Decl., at ¶ 5; Declaration of Lisa Carson, docket no. 18 ("Carson Decl."), at ¶ 4, Ex. J. The Student's class load was supported by his Section 504 plan, which was administered by the Student's high school counselor. Carson Decl., at ¶ 4–5. The Section 504 plan called for technology to assist the Student with self-editing, spelling, grammar, and handwriting. *Id.* at Ex. B. In response to the Student's parents' requests

and teacher input, the District modestly amended the Section 504 plan in January 2016 to allow the Student to submit assignments in writing or online. *Id.* at Ex. D.

At the start of the 2015 school year, the Student's parents asked the District to reimburse certain expenses incurred for private services secured for the Student by the Student's parents. AR 1841–43. The District declined and, instead, referred the Student's parents to Ms. Carson to review the Section 504 plan. AR 891–92. The parents declined and, instead, filed an IDEA administrative hearing request against the District on October 19, 2015. AR 1337; AR 362–66. The essence of the parents' request was a challenge to the District's decision to exit the Student from special education.[7]

The District filed a due process hearing request in January 2016 to defend its May 8, 2015 reevaluation. AR 294–95. The Office of Administrative Hearings (OAH), on behalf of the Office of Superintendent of Public Instruction (OSPI) consolidated the requests and held a four day hearing on January 19–22, 2016. AR 273; AR 2–27. Administrative Law Judge ("ALJ") Matthew D. Wacker heard testimony from twelve witnesses (AR 1, 4) and issued 56 Findings of Fact and 43 Conclusions of Law. *See* AR 2–27. The ALJ found that the Student had not met his burden on any claims. Specifically, the ALJ found that the May 8, 2015, reevaluation was appropriate, that any defects in the May 8, 2015, reevaluation did not deny the Student a FAPE, and that the District's decision to exit the Student from special education was legally correct. *See* AR 2–27. This lawsuit followed.

---

[7] In the weeks leading up to the hearing, the Student filed another request for another IEE at the District's expense. AR 282–83.

**Discussion**

**A. Standard of Review**

**Count One—Petition for Review of Administrative Action under the IDEA:**
The Court's review of the ALJ decision under the IDEA is a "mixture of discretion and deference." *J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1184 (W.D. Wash. 2002) (citing *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)). The Court must give "due weight" to the ALJ's findings, but the due weight given is within the Court's discretion. *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1126 (9th Cir. 2003). Two factors the Court should address in exercising its discretion are (1) the thoroughness of the administrative findings of fact and conclusions of law; and (2) whether the ALJ's findings are based on credibility determinations of live witness testimony. *J.S.*, 220 F. Supp. at 1184 (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995); *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 887–89 (9th Cir. 2001)). "The Court gives deference to an ALJ's decision 'when it evinces his or her careful, impartial consideration of all the evidence and demonstrates his or her sensitivity to the complexity of the issues presented.'" *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438–39 (9th Cir. 2010) (quoting *Cty. of San Diego v. California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1966)).

Recognizing the administrative agency's expertise, the Court "must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings

in part or in whole." *Ms. S. ex rel. G.*, 337 F.3d at 1126 n.16 (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)). The Court reviews the ALJ's legal conclusions *de novo*. *Id.* at 1127 (citing *Clyde K. v. Puyallup Sch. Dist. No. 3.*, 35 F.3d 1396, 1401 (9th Cir. 1994); *Seattle Sch. Dist., No. 1, v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996); *Amanda J.*, 267 F.3d at 889 n.11). Although mixed questions of fact and law are also reviewed *de novo*, "when the question is primarily factual, a more deferential approach is appropriate." *S.J. v. Issaquah Sch. Dist. No. 411*, No. C04-1926RSL, 2007 U.S. Dist. LEXIS 67735, at *4 (W.D. Wash. Sept. 12, 2007) (citing *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007)). The party challenging the ALJ's decision bears the burden of proof. *Id.*

**Count Two—Section 504:** The remaining claims under Section 504 are subject to the normal summary judgment rules. The Court should grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party meets its initial burden, the burden shifts to the non-moving party to present "significant probative evidence" supporting their claims. *Richards v. Neilson Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). While "all justifiable inferences" are to be drawn in favor of the non-moving party, *id.* at 255, when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment

is warranted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

**B. Whether the ALJ erred in concluding that the District did not deny the Student a FAPE**

**a. Legal Framework under the IDEA**

"School districts may deny a child a free appropriate public education [FAPE] by violating either the substantive or procedural requirements of the IDEA." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118 (9th Cir. 2016) (citing *M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 852 (9th Cir. 2014)). "A school district denies a child a free public education by violating IDEA's substantive requirements when it offers a child an IEP that is not reasonably calculated to enable the child to receive educational benefits." *Id.* (citing *J.W. ex rel. J.E.W.*, 626 F.3d at 432–33). "The school district may also, however, deny the child a free appropriate public education by failing to comply with the IDEA's extensive and carefully drafted procedures." *Id.* (citing *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038 (9th Cir. 2013)). "While some procedural violations can be harmless, procedural violations that substantially interfere with the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity, or actually cause a deprivation of educational benefits 'clearly result in the denial of a [free appropriate public education].'" *Id.* (quoting *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2007)).

**b. Level of Deference**

As a threshold matter, the parties dispute what level of deference should be given to the hearing officer's decision. Without specifying any of the ALJ's conclusions, the

Student argues that "[t]he hearing officer completely omitted discussion of considerable factual evidence that contradicts his findings." Motion at 7. In support of this argument, the Student cites to five pages of testimony (in the approximately 1900 page administrative record) that the Student claims the hearing officer failed to consider. *Id.* But a close reading of the administrative record demonstrates that this evidence doesn't actually conflict with the ALJ's findings when examined in context.

The Student goes on to state that the hearing officer failed to consider "evidence that the District itself considers basic writing skills as a component to Written Expression." *Id.* at 7–8. But again, the Student does not point to any place in the ALJ decision where these alleged failures somehow rendered his conclusions erroneous. The mere fact that the Student's general education teacher, Ms. Sutton, previously gave the student special education focused on conventions and mechanics does not undercut the IEP's determination that the Student no longer needed any SDI. The Student's position erroneously ignores large parts of the decision making process leading up to the 2015 reevaluation.

Finally, the Student cites to *Hawaii v. Rita L.* for the proposition that a hearing officer must explain his credibility determinations. No. 14-00034 DKW-RLP, 2014 U.S. Dist. LEXIS 173034 (D. Haw. Dec. 15, 2014). Glaringly, the Student does not identify any evidence that is actually in conflict. To the extent any evidence does conflict, it is immaterial to the key issues in dispute. This is in stark contrast to *Hawaii*, where the conflicting pieces of evidence and the credibility assessments made by the hearing officer were of "critical importance" to "her ultimate findings." *Id.* at *16.

1    Comparatively, the record shows that the ALJ heard testimony from the members

2  of the Student's IEP team and the District personnel that had observed the Student in the

3  classroom setting.  The testimony transcripts demonstrate that the ALJ actively

4  participated in questioning the witnesses and seeking clarification on points of confusion.

5    In his opinion, the ALJ expressly noted any evidentiary shortcomings and detailed

6  his analysis in weighing the available evidence in reaching his legal conclusions.[8]

7  Nothing in the record suggests that the ALJ's findings were not impartial or that he was

8  in any way insensitive to the complexity of the issues presented.  Instead, the ALJ's

9  findings relating to each of the material issues on appeal appear careful, thorough, and

10  well-reasoned.  *See generally* AR 5–14 (Findings of Fact); AR 14–26 (Conclusions of

11  Law).   Absent any real evidence to the contrary, and in light of the detailed nature of his

12  findings and the agency's expertise in the area of education, the ALJ's decision should be

13  given due deference.

14    **c.  Procedural Violations**

15    The Student argues that the hearing officer erred by concluding that any

16  procedural violations committed by the District in conducting the Student's May 2015

17  reevaluation did not result in denying the Student a FAPE.  The Student correctly

18  observes that WAC 392-172A-02000(2)(a) required the District to reevaluate the Student

19  before revoking the Student's special education services.  "[S]chool districts must

20  evaluate a student eligible for special education in accordance with WAC 392-172A-

21  _____

22  [8] For example, the ALJ noted that the Student's parents did not give any testimony about what occurred
    during the reevaluation meeting.  AR 13; *see also* AR 14 (noting that the evidence supporting the

23  Student's argument that the District failed to properly implement the IEE was "undeveloped").

03020 through 392-172A-03080 before determining that the student is no longer eligible for special education services." WAC 392-172A-03030. The Student argues that the District did *not* comply with these procedural requirements in at least five respects.

### i. Violations of WAC 392-172A-03020 through 392-172A-03080

<u>WAC 392-172A-03020(1).</u> The Student argues that the District's "Prior Written Notices" (or "PWNs") failed to comply with WAC 392-172A-03020 in two ways. First, the Student argues that two PWNs the District issued on March 16, 2014, and April 1, 2014, failed "to document the District's rejection of and refusal to consider the results of the WJ-III-'basic writing skills' subtest and the TOWL." Second, the Student asserts that "[t]he District also failed to indicate its rejection of and refusal to consider [the WJ-III and TOWL] in PWNs issued after the evaluation process . . ., in the evaluation report itself . . . , and in the Answer to the Parents' Due Process Complaint . . . ."

Both of these arguments fail. WAC 392-172A-03020(1) requires the District to "provide prior written notice of the parents of a student, in accordance with WAC 392-172A-05010, that describes any evaluation procedures the district proposes to conduct." Among other things, WAC 392-172A-05010(2)(a)–(c) requires a description of the proposed action, an explanation of why the agency proposes that action, and "[a] description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed . . . action[.]"

Importantly, these provisions do not explicitly require the District to provide the Student with a description of any procedures or assessments that the District did *not* use as a basis for the proposed action. *See generally* WAC 392-172A-05010. Furthermore,

the preponderance of the evidence suggests that the District did in fact consider the WJ-III and TOWL-3 test results in completing its evaluation. When asked about the District's use of the Student's scores on the WJ-III, the Student's school psychologist testified that "[f]or determining eligibility we look at all pieces of the puzzle. So [the WJ-III scores] would be one component that we would look at . . . ." AR 433–34.

The school psychologist was also asked "well, how did you use the results of the Test of Written Language [TOWL] in determining eligibility for Student?" AR 439. She responded: "Because it's not a test under our SLD criteria I . . . it as data." *Id.*; *see also* AR 457. The psychologist went on to confirm that "[i]n every circumstance I use all the data to" determine whether a student has a specific learning disability. AR 456. "So I would be looking at test scores, teacher feedback, grades, file review, student interview, all the pieces that would make up the assessment." *Id.*

This testimony is consistent with the District's reevaluation report: "Based on the private evaluation results provided by Jennifer R. Blair, PhD., file review, observation, interview, consultation, review of previous and current academic performance, and results of statewide standardized testing, [the Student] does not require specially designed instruction in any academic area at this time." AR 1186.

The Student provides no evidence contradicting this fact. Every single place in the record cited by the Student (AR 01162–63; AR 01182; AR 01198; AR 00325–328) explicitly references Dr. Blair's evaluation and confirms that Dr. Blair's findings formed the basis for the District's proposed action. At one point, the District goes so far as to "refer [the Student's parents] to the private evaluation report for a comprehensive

discussion of Ms. Blair's findings.  Results are briefly summarized below and a copy of

the private evaluation report is attached."  AR 1185.  Dr. Blair's report expressly

discusses the Student's scores on the WJ-III Basic Writing and TOWL-3 tests, and

provides a proposed course of action premised on the Student's performance on each test

Dr. Blair administered.  *See generally* AR 1125–36.[9]  The Student has failed to

demonstrate the ALJ erred in finding the District's PWN were sufficient.

WAC 392-172A-03020(3).  The Student argues that the District's reevaluation did

not assess the Student in all areas of suspected disability as required under WAC 392-

172A-03020(3).  WAC 392-172A-03020(3)(e) requires the District to ensure that "[t]he

student is assessed in all areas related to the suspected disability, including, if

appropriate, health, vision, hearing, social and emotional status, general intelligence,

academic performance, communicative status, and motor abilities."

Here, the Student suggests that the District violated this provision in two respects:

1) the District did not assess the Student for "basic writing skills or his ability to compose

written works beyond the sentence level[;]" and 2) failed to attribute the Student's

handwriting to anything other than a motor dysfunction.  The Student's first argument

fails for the same reason his PWN-related arguments fail.  Again, the Student does not

cite to a single place in the record suggesting that the District did not assess the Student

---

[9] The ALJ's findings of fact concerning Dr. Blair's IEE and corresponding report are very thorough.  *See* AR 6–9 (issuing 17 Findings of Fact concerning Dr. Blair's evaluation).

for writing skills.[10]  Without more, the Student has failed to meet his burden of proving that the District did not assess the Student's writing skills.

Concerning the Student's second argument, the Student seems to suggest that the District's reevaluation was not comprehensive because it did not consider whether the Student's poor handwriting was caused by something other than a motor issue.[11]  Again, the Student's position conflicts with the record.  Dr. Blair testified during the hearing that the Student's handwriting difficulties were "not related to fine motor dysfunction" and were instead "[m]ore of a language processing problem and/or a working memory issue." AR 953.  Dr. Blair tested the Student's language processing and memory abilities, and she expressly discussed the results of those tests in her report.  *See, e.g.*, AR 1128–29.

Beyond Dr. Blair's report, the District also considered input on the Student's handwriting from his teachers (AR 972–73, 975, 980–81), his parents (AR 1147–48), and a private OT assessment performed by a handwriting specialist (AR 1177–79; AR 577; AR 742–44).  In evaluating this information, the District concluded that the Student did not qualify for SDI, but nonetheless supported the Student's general education with a

---

[10] The record also contradicts this argument in numerous instances.  For example, the Student's General Education Report provided by the Student's school psychologist states in the "Significant Findings" section that while the Student's "spelling and editing skills were assessed to fall in the low average range . . . , there does not appear to be an adverse educational impact of his general education classes."  AR 1193. The District reiterated this observation verbatim in the PWN it furnished the Student's parents after completing its May 2015 reevaluation. *See* AR 1198.

[11] The Student's argument on this point is unclear.  In one breathe, the Student argues that the District's reevaluation solely relied on motor ability assessments.  In the next breathe, the Student admits that Dr. Blair testified that she did not attribute the Student's handwriting difficulties to any motor-related issue. Yet the District expressly relied on Dr. Blair's report in reevaluating the Student.  Consistent with her testimony, Dr. Blair's report reflects an array of non-motor related testing.

laptop equipped with word prediction software.  AR 1187.[12]  The ALJ's decision on this issue was not in error.

WAC 392-172-03040.  The Student next argues that the District's failure to consider his scores on the WJ-III and TOWL tests violated WAC 392-172-03040.  In determining eligibility for special education, WAC 392-172-03040(3) requires the District to "(a) Draw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the student's physical condition, social or cultural background, and adaptive behavior; and (b) Ensure that information obtained from all of these sources is documented and carefully considered."

The District's evaluation report shows that the District drew upon information from the Student's aptitude and achievement tests (*see* AR 1184–86), parent input (*see, e.g.*, AR 1189–90), teacher recommendations (AR 1192–93), the Student's physical condition (AR 1189; AR 1194–95), social background (AR 1186), and adaptive behavior (*see, e.g.*, AR 1196).  Live testimony provided at the hearing corroborates the fact that the District's IEP team did consider the Student's WJ-III and TOWL scores in reaching its eligibility determination.  The Student has not presented any evidence to the contrary,

---

[12] As the ALJ correctly notes, "[n]o one, including the Parents, identified any need for new or additional cognitive or academic achievement assessments given Dr. Blair's IEE report . . . ."  AR 10.  And even if the District did somehow violate WAC 392-172A-03020(3), such a procedural violation would be harmless.

1  and has failed to meet its burden of demonstrating a procedural violation under WAC

2  392-172-03040(3) for the District's failure to draw from a variety of sources.[13]

3      WAC 392-172A-03035 and -03080.  The Student next argues that the District's

4  reevaluation report violated WAC 392-172A-03035 and -03080.  WAC 392-172A-03035

5  sets forth the minimum requirements that must be included in an evaluation report.[14]

6  WAC 392-172A-03080(1) requires, in relevant part, an evaluation report to include a

7  statement of: "(a) Whether the student has a specific learning disability; (b) The basis for

8  making the determination, including an assurance that the determination has been made

9  in accordance with WAC 392-172A-03040;" and "(e) Whether: (i) The student does not

10 achieve adequately for the student's age or meet state grade level standards in one or

11 more of the areas described in WAC 392-172A-03055(1)[.]"

12      The Student maintains that the District's May 2015 reevaluation report violates

13 these provisions in two ways.  First, the Student argues that the report "provides no

14 relevant discussion of the data it relied on in making the eligibility determination and

15 provides no indication that any of the documented data was rejected."  Motion at 13.  The

16 face of the report flatly contradicts this statement, and expressly confirms that the

17

---

18 [13] The Student does not meaningfully argue that the District failed to "document or carefully consider" the
19 information gathered from these sources under WAC 392-172-03040(3)(b), and the record does not
    otherwise indicate a violation of this provision.  *Accord M.M.*, 2014 U.S. App. LEXIS 19879, at *22–24.

    [14] "(a) A statement of whether the student has a disability that meets the eligibility criteria in this chapter;
20 (b) A discussion of the assessments and review of data that supports the conclusion regarding eligibility
    including additional information required under WAC 392-172A-03080 for students with specific
21 learning disabilities; (c) How the student's disability affects the student's involvement and progress in the
    general education curriculum . . . .; (d) The recommended special education and related services needed
22 by the student; (e) Other information, as determined through the evaluation process and parental input,
    needed to develop an IEP; (f) The date and signature of each professional member of the group certifying
23 that the evaluation report represents his or her conclusion."

eligibility determination was made pursuant to Dr. Blair's report, a review of the

Student's file, observation, interview, consultation, review of previous and current

academic performance, and results of statewide standardized testing.  AR 1186.

Likewise, nothing in the report—nor any other evidence in the record—suggests that the

District "rejected" any documented data.

Second, the Student suggests that the report "fails to indicate the professional

judgment to use [the Student's] general ability index to determine severe discrepancy

[sic], [the Student's] criterion score or the District's rejection of Dr. Blair's assessments

and ultimate conclusion."  Motion at 13.  Although unclear, the Student appears to argue

that the District's failure to discuss the Student's "criterion score" alongside its

discussion of the Student's General Ability Index ("GAI") "cognitive score" is a violation

of either WAC 392-172A-03035 or WAC 392-172A-03080.

Neither of these provisions requires an evaluation report to include a statement of

professional judgment.  The Student does not otherwise articulate how a failure to include

such a statement violates any requirement in either of these provisions.  To the contrary,

the report states that the Student did not have a disability that met the eligibility criteria

(AR 1186), discussed the assessments and data used by the District supporting its

eligibility determination (AR 1184–85; AR 1189–97), the recommended services needed

by the student (AR 1187), the date and signature of each group member certifying the

report (AR 1188), an assurance that the determination was made in accordance with the

1    Washington Administrative Code (AR 1187),[15] and statements concerning whether the

2    Student met state grade level standards (AR 1186, 1190–93).

3           As the ALJ correctly observed, the only shortcoming in the reevaluation report is

4    its failure to include "a statement of whether the student does not achieve adequately for

5    the student's age or meet state grade level standards in one or more of the areas identified

6    in WAC-172A-03055(1)." AR 23. But the ALJ concluded that this was a harmless error

7    that did not amount to a FAPE denial. *Id.* Beyond this harmless violation, the

8    preponderance of the evidence demonstrates that the District's May 2015 reevaluation

9    report complied with WAC 392-172A-03035 and WAC 392-172A-03080.

10          The District cites to WAC 392-172A-03070(2) for the requirement that a report

11   contain a statement of professional judgment. That provision allows—but does not

12   require—an IEP group to apply professional judgment. When the IEP group applies

13   professional judgment, it must analyze the available data and information to determine if

14   a severe discrepancy exists. *Id.* "[T]he group shall document in a written narrative an

15   explanation as to why the student has a severe discrepancy, including a description of all

16   data used to make the determination through the use of professional judgment." *Id.*

17          Here, nothing in the record indicates that the evaluation results were somehow

18   inaccurate, thereby triggering the need for the Student's IEP group to apply professional

19   judgment. *See* AR 23. Because the Student has not established that the group did apply

20   professional judgment, the corresponding reporting requirements in WAC 392-172A-

21

22   [15] Insofar as the report's failure to pin cite WAC 392-172A-03040 amounts to a procedural violation, such
     a violation is harmless.

23

03070(2) would not be prompted.  Thus, the Student's challenge to the IEP team's failure to document its use of professional judgment is moot.  *See* Plaintiff's Reply at 9 n. 6. And even if the IEP group applied professional judgment, the evidence shows that they adequately met the "written narrative" requirement in the statute.

### ii.  FAPE Denial

The Student argues that the District's procedural violations denied the Student a FAPE "by erroneously exiting him from special education . . . and also significantly impeded the Parents' opportunity to participate in the decision making process."

First, the Student maintains that because the District did not conduct the May 2015 reevaluation in accordance with the above-discussed procedural requirements, its decision to exit the Student from special education was erroneous.  This argument is unpersuasive.  Because the District did not commit any harmful procedural violations, it did not deny the Student a FAPE.  *Timothy O.*, 822 F.3d at 1124.  No procedural violation committed by the District denied the Student any educational opportunity.  The Student has not presented any evidence of any alternative educational possibilities that the District didn't consider.  *See Doug C.*, 720 F.3d at 1047.  Nor has the Student demonstrated that the District would have "better considered" any of those undefined possibilities absent any of the alleged procedural violations.

Next, the Student posits that the District's "failure to provide adequate PWN together with providing an insufficient evaluation report significantly impeded the Parents' ability to participate in the process."  The Student's reliance on *Union Sch. Dist. v. Smith*, 15 F.3d 1519 (9th Cir. 1994) to support this point is misplaced.  In that case, the

Ninth Circuit affirmed a district court's entry of summary judgment awarding expense reimbursement to a family who placed their handicap child in private counseling after the school district denied that child a FAPE. *Id.* at 1527. In contrast to the instant dispute, the issue in *Smith* was whether the district denied the student a FAPE by failing to provide *any* PWN to the student's parents. *Id.* at 1525–26. In discussing the importance of a PWN, the Ninth Circuit emphasized that "[t]he requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later . . . . Furthermore, a formal specific offer from a school district will greatly assist parents in 'presenting complaints with respect to any matter relating to the . . . educational placement of the child." *Id.* (quoting 20 U.S.C. § 1415(b)(1)(E)).

As a threshold matter, *Smith* is inapplicable here because the District did provide parents with the requisite PWNs each time a decision was made. On March 16, 2015, the District sent (and the parents signed) correspondence confirming that the District planned to conduct a reevaluation that would "review Dr. Blair's assessment and complete additional testing" in specified areas. AR 1182–83; *see also* AR 1142.

On April 1, 2015, the District furnished a PWN confirming that it was amending the Student's "IEP upon the completion of his [IEE] with Dr. Blair and the team's discussion of changes to the accommodations, as well as the Parent's request to amend the annual goals in light of Dr. Blair's findings . . . ." AR 1162. On May 8, 2015, the District submitted a PWN confirming the results of its reevaluation, which was expressly premised on Dr. Blair's evaluation results, among other things. AR 1198–99.

1       Outside of these PWNs, the record contradicts any argument that the Student's

2    parents were somehow impeded in fully participating in the evaluation process.  The

3    Student's parents selected Dr. Blair to administer the IEE.  *See* AR 883, 1125–36, 1142–

4    46.  The mere fact that the Student's parents now disagree with the results of the agreed-

5    upon evaluation after the eligibility determination was made is insufficient to establish a

6    procedural violation.  *Miller v. Monroe Sch. Dist.*, 131 F. Supp. 3d 1107, 1115–16 (W.D.

7    Wash. 2015); *see also Ms. S.*, 337 F.3d at 1133.

8       Beyond the Student's allegations, nothing in the record suggests that the District

9    withheld any information from the Student's parents in reaching its eligibility

10   determination.  To the contrary, the record shows that the District conferred with the

11   parents at every step of the way—beyond its disclosure obligations imposed in the

12   regulations—in designing and completing the May 2015 reevaluation.  The

13   preponderance of the evidence establishes that the District took every reasonable step to

14   ensure the Student's parents had the opportunity to meaningfully participate in the

15   decision making process at each juncture.  More importantly, the record shows that the

16   Student's parents did actually participate, and that the District incorporated the parents'

17   input into reaching its decision to exit the Student from special education.  The mere fact

18   that the parents now disagree with that decision is insufficient to demonstrate that any

19   procedural violation amounted to the District denying the Student a FAPE.  The ALJ's

20   decision on this issue was not in error.  *See* AR 35.

21

22

23

### d. Substantive Violations

The Student also argues that the District's eligibility determination violates the IDEA's substantive prong in two main respects. First, the Student asserts that the preponderance of the evidence shows that he has a disability within an IDEA SLD category. Second, the Student asserts that the preponderance of the evidence shows that accommodations alone will not remediate his deficiencies.[16]

### i. Whether the Student has an SLD

First, the Student argues that Dr. Blair's report is evidence that the Student was eligible for SDI in "Written Expression." As is the case here, "[i]f a school district uses a severe discrepancy model, it will use the OSPI's published discrepancy tables for the purpose of determining a severe discrepancy between intellectual ability and academic achievement." WAC 392-172A-03065(1). The IEP group "may determine that a student has a specific learning disability if . . . the group finds that the student has a severe discrepancy between achievement and intellectual ability in one or more of the areas identified in subsection (1) of this section[.]" WAC 392-172A-03055(2)(a). Subsection (1) lists "Written Expression" as an identified area of disability.

The OSPI discrepancy table compares a student's General Ability Index IQ[17] to the Criterion Score attained in an OSPI-recognized test. *See* AR 1520, 1522. To find a

---

[16] The Student also argues that "the preponderance of the evidence shows [the Student] continues to need SDI in written expression." Motion at 21. The Student does not cite any evidence in support of this argument. *Id.* The evidence shows the opposite: The Student's IEP team determined that the Student did *not* qualify for SDI and, to the extent that he had any remaining difficulties, they could be remedied with the accommodations offered by the District.

[17] The parties do not appear to contest that the "IQ" column in the OSPI discrepancy table reflects the "General Ability Index" instead of the "Full Scale IQ."

severe discrepancy for a student with a General Ability Index of 105 (as was the GAI reflected in Dr. Blair's report for the Student (*see* AR 1129)), the OSPI discrepancy table requires a Criterion Score of 86.  AR 1522.

The Student argues that a severe discrepancy exists "as measured by the WJ-III 'basic writing skills' subtest."  This argument fails for at least three reasons.  First, "Basic Writing Skills" is not an area identified in WAC 392-172A-03055(1).[18]  Second, the Student's WJ-III score of 92 in "Written Expression"—an area that *is* listed WAC 392-172A-03055(1)—does not qualify as a severe discrepancy under the OSPI discrepancy table for an individual with a 105 GAI.  *Compare* AR 1130, *with* AR 1520.  Finally, insofar as a severe discrepancy does exist, nothing in the regulations required the IEP group to conclude that the Student had an SLD.  *See* WAC 392-172A-03055(2)(a).  The Supreme Court has directed that "we are not free 'to substitute [our] own notions of sound educational policy for those of the school authorities which [we] review.'" *Amanda J.*, 267 F.3d at 887 (quoting *Rowley*, 458 U.S. at 206).  District officials gave substantial testimony indicating that the IEP group no longer believed the Student needed SDI because his basic writing difficulties—irrespective of which OSPI category they might fit into to—were not adversely affecting his performance.  *See, e.g.*, AR 451–453, 535, 745–46, 876–880, 978–81.

---

[18] The Student argues unpersuasively that the "Basic Writing Skills" subtest of the WJ-III should be construed as a component of the "Written Expression" category identified in WAC 392-172A-03055(1). *See* Motion at 16–18.  The Student provides no evidence or legal authority for this conclusion.  Likewise, the mere fact that the OSPI Guidelines contemplate the use of supplemental subtests—and that Dr. Blair testified that other subtests could be appropriate in various instances—does not alter the IEP group's determination that the Student did not qualify for an SLD under WAC 392-172A-03055.

Beyond Dr. Blair's report, the Student appears to argue that his prior IEPs and evaluations support continuing eligibility for "Written Expression" SDI.[19] This position directly conflicts with WAC 392-172A-02000(2)(a) which states that "[a] student determined eligible for special education services shall remain eligible until . . . [a] group of qualified professionals and the parent of the student . . . determines the student is no longer eligible for special education[.]" This is precisely what happened here.

The Student next attacks the school psychologist's failure to consider the Student's academic performance while observing him in his general education classroom under WAC 392-172A-03075(2)(b). *See* AR 461 (Q. Did you consider Student's academic performance while you were observing him? A. No.). The testimony leading up to this question—as well as the reevaluation report itself—demonstrates that no such violation occurred. Prior to this question, the psychologist testified that she observed the Student in his English class "in the area of concern which was English and written expression." AR 459. The psychologist's report included in the reevaluation (AR 1196) also shows that she did observe the student in his general English class and took detailed notes about the student's performance occurring at that time—down to the very minute. *Id.* The preponderance of the evidence is that the psychologist did in fact observe the student's academic performance in compliance with WAC 392-172A-03075(2)(b).[20]

Next, the Student argues that the District failed to properly weigh the Student's prior accommodations and SDI in determining his ongoing eligibility. The Student cites

---

[19] This section of the Student's Motion appears to have been truncated.

[20] And even if this were a violation, the Student does not identify how this shortcoming implicates any substantive aspect of the IDEA or was otherwise a harmful procedural violation.

to *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1375 (8th Cir. 1996) for the proposition that "an adverse impact must be found 'if the child's educational performance would have been adversely affected but for the specialized instruction that the child was receiving.'" Motion at 19.

*Yankton* has limited applicability here. In that case, the Eighth Circuit stated that "[t]he record here establishes that but for the specialized instruction and services provided by the school district, [the student's] ability to learn and do the required class work would be adversely affected by her [disability]." 93 F.3d at 1375. The court found that the student still required special education services, and required the school district to continue providing those services. *Id.* at 1375–76.

As the District correctly points out, the record here is replete with evidence that the Student's ability to learn and class work did not depend on the SDI he was receiving prior to the May 2015 reevaluation. *See, e.g.*, AR 452–53, 535, 979, 1190–1193.[21] Conversely, the Student cites to testimony describing the SDI the Student received prior to the May 2015 reevaluation. AR 792, 797, 806, 808, 977, 1192. But nothing in this evidence—nor anything else in the record—demonstrates that but for the SDI the Student received, his ability to learn and perform would have suffered.

Next, the Student relies on *W.H. v. Clovis Unified Sch. Dist.* in arguing that the IEP team placed undue weight on the Student's grades in making their decision. No. CV F 08-0374 LJO DLB, 2009 U.S. Dist. LEXIS 47736 (E.D. Cal. June 8, 2009). *W.H.* does

---

[21] In light of the evidence discussed here, the Student's suggestion that the "basic" rating the Student receiving on his state writing test in 7th grade is insufficient to meet his burden of proof. *See* Motion at 20.

not support this conclusion.  In that case, the court found that the record established

written expression as an area of disability for the student.  *Id.* at *49–50.  In reversing the

ALJ's contrary finding "that writing was not a suspected need," the court observed that

the ALJ placed too much weight on the student's grades because the grades "were

inflated and did not assess Student's written expression."  *Id.* at *50.  Specifically, the

student's Section 504 plan only required the student to complete 50% of all work.  The

evidence showed that, in fact, he "only finished 10%–30% of the assigned work for his

grade."  *Id.*  Because the Student's grade was not impacted by assignments he did not

finish, and because he did not turn in written assignments, the student's grades were not

an accurate reflection of the student's performance.  *Id.* at *50–51.

Here, the record shows that some of the Student's grades were not impaired by

any "spelling or grammar errors in writing[.]"  AR 1192.  Other parts of the record

suggest that, in utilizing his other accommodations, the Student was actually "able to

show self-correction on many of his own errors . . . ."  AR 977.  To the extent the Student

was able to self-correct any spelling or grammar errors, his corresponding grades would

be an accurate reflection of his performance, independent of any grade-specific

accommodations similar to the ones considered in *W.H.*  Either way, *W.H.* does not

dictate that the IEP group's decision to consider the Student's grades here was somehow

improper.  The evidence shows that the IEP group considered the conditions unique to

the Student's grades when making their determination.  The Student provides no

evidence that the IEP group gave these grades undue weight in reaching their decision.

### ii. Whether accommodations will remediate the Student's difficulties

The Student next argues that the accommodations proffered by the District will not remediate the Student's deficiencies. The Student correctly cites to *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 992 (2017) for the principle that "[t]o meet its obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's curriculum." The Ninth Circuit recently clarified this standard in *M.C. v. Antelope Valley Union High Sch. Dist.*: "In other words, the school must implement an IEP that is reasonably calculated to remediate and, if appropriate, accommodate the child's disabilities so that the child can 'make progress in the general education curriculum,' taking into account the progress of his non-disabled peers, and the child's potential." 858 F.3d 1189, 1201 (9th Cir. 2017) (citations omitted) (quoting *Endrew F.*, 137 S. Ct. at 994).

The Student points to two pieces of testimony in support of his position that accommodations alone are inadequate to cure his difficulties in writing. First, he cites to Dr. Blair's testimony in which she opines that it would not "be appropriate to only provide accommodations for the Student." AR 944. She goes on to clarify that "accommodations are . . . not curative or remedial. . . . [I]n his case he needs to learn how to spell. He needs to learn how to make a proper letter, to form all his letters from the top to the bottom, for example, to capitalize at the beginning of sentences, to provide punctuation at the end just to make his writing more readable. And we are not always able to write with a keyboard. Although technology is moving in that direction it's not appropriate in all cases to use a keyboard with a spell check." AR 944–45. She proceeds

to testify that, "on a more-probable-than-not basis," the Student's basic writing skill levels will not increase with accommodations alone.  AR 945.

Second, he cites to Ms. Jewell's testimony that "grammar and spell check" will not remediate his writing difficulties.  AR 644.

On its face, both Dr. Blair and Ms. Jewell's testimony conflicts with the IEP team's conclusion—reflected in the reevaluation report and their testimony—that accommodations alone would remediate the Student's writing issues.  But the ALJ's reliance con the IEP team's testimony over Dr. Blair and Ms. Jewell is not necessarily error.  *See N.B. v. Hellgate Elementary Sch.*, 541 F.3d 1202, 1212 (9th Cir. 2008).

Instead, the evidence indicates that the ALJ's decision was appropriate for several reasons.  First, Dr. Blair's testimony is much more general and broad-sweeping than the testimony given by IEP team members.  *See* AR 442–43, 719.  Second, unlike members of the IEP team, Dr. Blair did not observe the Student in the classroom environment in assessing his performance—unlike various members of the IEP group who had personal knowledge of his in-class performance.  Third, Dr. Jewell's statement that "grammar and spell check" will not cure the Student's writing difficulties fails to consider the *other* accommodations offered by the District.   These additional accommodations (which the evidence shows was considered by the IEP team) included additional time to finish assignments, a change in class setting for test taking, no loss of credit for spelling/grammar errors in writing, and the use of word prediction software.  AR 1187.  Dr. Jewell's testimony does not appear to meaningfully assess these other

accommodations.  The Student has not demonstrated that the ALJ erred when he gave greater weight to the opinions of the IEP team staff.

The Student has not met his burden of showing that a preponderance of the evidence establishes a substantive violation of the IDEA.  Because the Student has failed to prove a harmful procedural violation or a substantive violation of the IDEA—or otherwise show that the ALJ committed any reversible error—the Student is not entitled to another IEE at the District's expense and may not recover on any other corresponding relief he requests.  *See* Motion at 21–22.  Because the Student has not met his burden of showing that the ALJ's determination was in error, *see* AR 25, the Student's request for reversal of the administrative decision is denied.

**C. Whether the Student's Section 504 Claim Should be Dismissed**

    **a.  Discrimination**

        **i.  Elements of Claim**

Section 504 "contains an implied right of action for damages to enforce its provisions."  *Mark H. v. Lemahieu*, 513 F.3d 922, 935 (9th Cir. 2008).  A plaintiff suing under Section 504 for discrimination "must show (1) she is a qualified individual with a disability; (2) she was denied 'a reasonable accommodation that [she] needs in order to enjoy meaningful access to the benefits of public services;' and (3) the program providing the benefit receives federal financial assistance."  *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (quoting *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010)).

A plaintiff can establish the second element in one of two ways.  *Id.*  First, a plaintiff may show that a student was denied services "needed to enjoy meaningful access

to the benefits of a public education and that were available as reasonable accommodations." *Id.* Second, the plaintiff may show that the student was denied "meaningful access to public education through another means, such as by violating a regulation that implements section 504's prohibitions." *Id.* (citing *Lemahieu*, 513 F.3d at 938–39; *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

Finally, to prevail on a Section 504 claim, "plaintiffs must prove a *mens rea* of 'intentional discrimination' . . . [and] that standard may be met by showing 'deliberate indifference,' . . . not only by showing 'discriminatory animus.'" *Lemahieu*, 513 F.3d at 938 (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001)). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . . likelihood." *A.G.*, 815 F.3d at 1204 (quoting *Duvall*, 260 F.3d at 1139). "The plaintiff establishes the requisite knowledge (or notice) on behalf of the defendant when she shows that she 'alerted the public entity to [her] need for accommodation (or when the need for accommodation is obvious, or required by statute or regulation).'" *Id.*

At issue is: 1) whether the District violated 34 C.F.R. § 104.33 by improperly exiting the Student from special education and denying him a FAPE;[22] and 2) whether the District acted with deliberate indifference.

---

[22] The Student characterizes this argument as a "failure to accommodate" but, beyond the alleged failure to provide the Student with continuing SDI, the Student does not actually discuss any other accommodation that was not provided. Thus, this memorandum resolves this issue under the "Section 504 violation" framework.

### ii. Violation of 34 C.F.R. § 104.33

The disputed provision defines an "appropriate education" as "the provision of regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as the needs of nonhandicapped persons are met . . . ." 34 C.F.R. § 104.33(b)(1); *see also A.G.*, 815 F.3d at 1203. "Section 504's regulations gauge the adequacy of services provided to disabled individuals by comparing them to the level of services provided to individuals who are not disabled." *A.G.*, 815 F.3d at 1203. "Plaintiffs who allege a violation of the [Section 504] FAPE requirement . . . may not obtain damages simply by proving that the IDEA FAPE requirements were not met." *Lemahieu*, 513 F.3d at 933; *accord J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 570 F. Supp. 2d 1212, 1227 (E.D. Cal. 2008).

In support of his argument that the District violated 34 C.F.R. § 104.33, the Student states that "[a]t the time [the Student] was evaluat[e]d he was at an approximate 5th grade level in basic writing skills and at a third grade level in contextual conventions although he was a Freshman in high school." Plaintiff's Reply at 15 (citing AR 1130–31). While the Student's limitations in basic writing skills and contextual conventions may be true, the Student fails to cite any evidence that the District's decision to exit him from SDI somehow denied him meaningful access to education. To the contrary, the record evidence shows that he has achieved passing grades in all of his tenth grade classes. Carson Decl., Ex. J. The record further demonstrates that the Student played a role in selecting these general education classes and "has not been treated any differently than any non-disabled student in his class scheduling." *Id.* at ¶ 16. These facts show that

the Student did have meaningful access to public education through the accommodations

provided by the District.

The District has met its burden of establishing the absent of any genuine issue of

material fact concerning whether the District violated 34 C.F.R. § 104.33 or otherwise

denied the Student a FAPE. The Student's unsupported assertions to the contrary

(Plaintiff's Reply at 14–15) are insufficient to withstand the District's request for

summary judgment on the Student's discrimination claim.[23]

### iii.  Deliberate indifference

The Student presents two pieces of evidence in support of its argument that the

District acted with deliberate indifference. First, the Student cites excerpts from

evaluation reports prepared by the District for other students. *See* Plaintiff's Reply at 16

(citing Declaration of Angela Shapow, docket no. 25 ("Shapow Decl."), Ex. 18). The

Student relies on this evidence to suggest that the District deliberately chose not to

consider the Student's basic writing skills in determining that the Student no longer

qualified for an SDI.

The Court need not reach the District's argument that this evidence should not be

considered because it was not properly introduced pursuant to the IDEA's procedures

(*see* District's Reply at 12 n.7). Even if this evidence were properly admitted, the mere

---

[23] The sole case relied on by the Student in support of its discrimination argument, *Hamamoto*, is readily distinguishable. In that case, the Ninth Circuit expressly held that "[t]here [wa]s evidence supporting each of the[] allegations" concerning the movants' inability to enjoy meaningful access to the benefit of a public education. 620 F.3d at 1098. Here, no such evidence exists. Moreover, the Ninth Circuit found that the defendant in *Hamamoto* was on notice that the movants needed reasonable accommodations but failed to give them. *Id.* Here, the undisputed evidence demonstrates that the District is still providing the Student with accommodations notwithstanding that he no longer receives SDI. *See, e.g.*, Carson Decl., Ex. D ("Student 504 Plan Details" summarizing the Student's accommodations).

fact that the District chose to evaluate other students with other disabilities differently than the Student does not mean it acted with deliberate indifference in exiting the Student from SDI. Critically, nothing in this evidence demonstrates that the Student alerted the District of a need for an additional accommodation, and the District failed to act on that request. *A.G.*, 815 F.3d at 1204. Nor does this evidence suggest that the District was aware of a substantial likelihood that the method it employed in evaluating the Student would violate any protected right.

Second, the Student points to the District's own evaluation protocol. Plaintiff's Reply at 16. To the extent this evidence is properly before the Court (*see* District's Reply at 12 n.7), it is insufficient to create any issue of fact that the District acted with deliberate indifference. The Student cites to a section in the protocol entitled "Recommendations to IEP Committee" in arguing that the District acted intentionally in failing to consider conventions in its assessment. This argument fails for at least two reasons. First, the evidence does not show that the District failed to consider writing conventions in deciding to exit the Student from SDI. To the contrary—and as extensively discussed above—the record unequivocally demonstrates that Dr. Blair assessed the Student's basic writing skills and that, in turn, the District relied on that report in completing the May 2015 reevaluation. Second, even if the District did fail to assess the Student's writing, nothing in this protocol required the District to do so. Nor does the Student put forth any authority supporting the proposition that a district's failure to follow its model protocol is sufficient to establish deliberate indifference.

In sum, the District has met its initial burden of demonstrating an absence of material fact as to whether the District discriminated against the Student when it exited him from SDI. The Student, in turn, has failed to proffer any evidence creating any issue of fact that the District violated Section 504 or acted with deliberate indifference.

### b. Retaliation

To establish a prima facie retaliation claim, a claimant must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001). Concerning the third element, the required nexus is the more stringent "but for" causation. *T.B. v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015). At issue is the third element—whether the Student can demonstrate any causal connection between the District's exit decision and the Student's pursuit of a due process complaint.

The District's reliance on the *T.B.* case is persuasive. Like here, the plaintiff's retaliation claim was before the court on defendant's motion for summary judgment. *See* 806 F.3d at 472–73. Also like here, the plaintiff charged the defendant with retaliating against plaintiff's "aggressive advocacy" on behalf of the student. *Id.* In affirming the district court's summary judgment dismissal of plaintiff's claim, the Ninth Circuit concluded that "[n]o reasonable jury could conclude that the [plaintiff] made out a prima facie case of retaliation." *Id.* More specifically, the court determined that no reasonable jury could find that the defendant would have reached a different decision in carrying out

its adverse action against plaintiff but for plaintiff's advocacy on the student's behalf. *Id.* Instead, there were other plausible reasons supporting the defendant's adverse action.

Likewise here, no reasonable jury could conclude that the Student has made out a prima facie retaliation claim. The Student's only argument in support of its retaliation claim is that the District's decision to exit the Student from SDI was close in time to the Student's settlement of his first due process request. Plaintiff's Reply at 17–18. While the Student might be correct that the due process request and the exit decision were close in temporal proximity, the Student has failed to put forth any evidence suggesting that, but for the due process request and corresponding settlement, the District would have decided to keep the Student in SDI. *T.B.*, 806 F.3d at 473.

Rather, the evidence demonstrates other legitimate reasons why the District chose to exit the Student. The District decided to reevaluate the Student in October 2014— months before the due process request was filed (in January 2015) and subsequently settled (in April 2015). *See* AR 1464. Moreover, a student under the age of 18 who has not yet graduated high school cannot be exited from special education without a reevaluation. WAC 392-172A-02000(2). Accordingly, the Student's suggestion that the District somehow acted improperly when it issued an April 1, 2015, PWN is unconvincing. Plaintiff's Reply at 17. The District offered the Student continued special education after Dr. Blair issued her report because it was required to do so. Importantly, the District would have violated the IDEA by exiting the student in April 2015 without completing its reevaluation, which was not done until May 2015.

On February 27, 2015, the parties discussed the possibility of initiating the reevaluation of the Student in response to Dr. Blair's findings. AR 1162. The Student's parents proffered their consent to the reevaluation on March 16, 2015, and the District completed the reevaluation on May 8, 2015. Beyond the sole fact that the parties settled the Student's due process request between these two dates, the Student has failed to put forth any evidence that the District's payment of settlement funds to Student had any influence on the exit decision—let alone a "but for" influence on that decision.

The Student has failed to establish a prima facie case for retaliation. The Court need not reach the parties' remaining arguments concerning the burden shifting analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Student's retaliation claim is dismissed.

**Conclusion**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment, docket no. 13, is DENIED, Defendant's Cross-Motion for Summary Judgment, docket no. 16, is GRANTED, and this case is DISMISSED with prejudice.

IT IS SO ORDERED.

Dated this 27th day of October, 2017.

Thomas S. Zilly
United States District Judge